IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

FILED

JUN 23 2020

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

STEVEN DAGUSTINO,
ANDRE STORES, AND
WILLIS WILLIAMS,
    PLAINTIFFS

      V.

MIKE DEWINE,
ANNETTE CHAMBERS-SMITH, AND
LYNEAL WAINWRIGHT,
sued in their individual AND
official capacities,
    DEFEDANTS.

At all times relevant to the events
described herein, the defedants
have acted AND continue to act
under color of state law.

CASE NO. 3:20 CV 1375

JUDGE CARR
JUDGE

MAG. JUDGE JAMES R. KNEPP II
MAGISTRATE

COMPLAINT FOR MONEY DAMAGES,
DECLARATORY RELIEF, AND INJUNCTIVE
RELIEF

1

## I. JURISDICTION

1. Plaintiffs bring this lawsuit pursuant to 42 U.S.C. 1983. This court has jurisdiction under 28 U.S.C. 1331 and 1343. Plaintiffs also seek a declaratory judgement pursuant to 28 U.S.C. 2201 AND 2202.

## II. VENUE

2. Venue is proper in this judicial district and division, UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, EASTERN DIVISION, pursuant to 28 U.S.C. 1391(b)(1) because Defendant Wainwright is believed to reside in Richland County.

## III. PREVIOUS LAWSUITS

3. Plaintiff Dagustino has no prior lawsuits.

4. Plaintiff Stores has no prior lawsuits.

5. Plaintiff Williams currently has a pending action in the Franklin County Court of Common Pleas, Franklin County, Ohio,

2

Willis Williams v. Ohio Parole Board,
Case No. 20CV-003154.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

6. Pursuant to OAC 5120-9-31, Plaintiffs each completed the 3-step inmate grievance procedure. Plaintiffs Dagustino and Stores also completed the 1-step grievance against the warden procedure. As such, Plaintiffs have exhausted their administrative remedies as required by 42 U.S.C. 1997e(A). Exhibits A - E are attached as evidence of such.

## V. PARTIES

7. Plaintiff Steven Dagustino (A752584) was at all times relevant to this action a prisoner incarcerated at Marion Correctional Institution ("MCI") within the Ohio Department of Rehabilitation and Correction ("ODRC").

8. Plaintiff Andre Stores (A314976) was at all times relevant to this action a prisoner

3

incarcerated at MCI within the ODRC.

9. Plaintiff Willis Williams (A760782) was at all times relevant to this action a prisoner incarcerated at MCI within the ODRC.

10. Defendant Mike DeWine was at all times relevant to this action the Governor of the State of Ohio and, as such, is the ultimate executive authority over the ODRC. He was acting and continues to act under the color of federal and state law. Article III, Section 5 of the Ohio Constitution vests the "supreme executive power of the state" in the Governor, and Section 11 vests the power, after conviction, to grant reprieves, commutations, and pardons.

11. Defendant Annette Chambers-Smith was at all times relevant to this action the Director of the ODRC, and was acting and continues to act under the color of federal and state law. She is vested with authority over the ODRC pursuant to O.R.C. 5120.01, which states that prisoners committed to ODRC are under her legal custody. O.R.C. 2967.13,

4

Sentence reduction or early release due to over-crowding emergency, and O.R.C 2967.19, Petition by director of rehabilitation and correction to sentencing court to release offender, are two of the relevant statutes of her authority relevant to this action.

12. Defendant Lyneal Wainwright was at all times relevant to this action the Warden at MCI within the ODRC and was acting under the color of federal and state law. The Warden is the managing officer of a prison and is responsible for ensuring the safety and well-being of prisoners under her supervision.

13. Each defendant is sued under his or her individual and official capacities.

14. At all times relevant to the events described herein, the defendants have acted and continue to act under color of state law.

5

## VI. INTRODUCTION

15. As a tragic combination of infectious and deadly, COVID-19 poses a once-in-a-lifetime threat on a world-wide scale. Every state and territory in the United States has now been impacted. According to Johns Hopkins University ("JHU") as reported by CNN, the U.S. has over 1.8 million confirmed cases of COVID-19 and over 100,000 deaths from COVID-19 as of May 31, 2020.

16. Cramped, overcrowded prisons amplify this threat. With thousands of people literally stacked on top of each other and unable to move around without rubbing shoulders, such environments are fundamentally incompatible with medically-indicated social distancing and hygiene protocols. As a result, they present a grave threat not only to prisoners and staff, but also to the broader community by enabling the spread of COVID-19 both inside and outside the prison walls.

17. As of March 2020, 48,765 individuals were incarcerated in Ohio. Ohio's prisons utilize close living quarters, primarily relying on either

cells or dorm-style units. The nature of these units, in conjunction with work, worship, education, and food-service times guarantee non-compliance with social distancing guidelines as set forth by Ohio's Department of Health ("ODH") as well as the United States Centers for Disease Control and Prevention ("CDC") and the World Health Organization ("WHO"). The setting is comparable to that seen in nursing homes, cruise ships, and U.S. Navy warships, all of which have seen devastating outbreaks.

18. As of March 2020, ODRC employed 12,192 staff members, many of whom may have unknowingly transported the virus into prisons while asymptomatic. Those staff members were denied the opportunity to wear appropriate face masks until April 2020, at which time they were provided with one mask offering limited protection. The nature of prisons poses a significant risk of transfer between staff and prisoners as well as between staff and their communities.

19. The devastating COVID-19 attack within Ohio's prisons has resulted in exponentially

increasing numbers of positive cases and a climbing
death toll for both staff and prisoners. Prisoners
are spread across 28 institutions — most of
which house over a thousand people in very
tight quarters where social distancing is impractible
or impossible.[1] Moreover, other protective
measures — including regular handwashing and
sanitizing — are more logistically complicated
in Ohio's correctional institutions.[2]
Consequently, all incarcerated people are at risk
of contracting COVID-19, and those who are
elderly and/or suffer from chronic medical conditions
are at even greater risk.[3] In fact, a professor

---

[1] Turner and Levy (Aug. 2009), "Pandemic Influenza
Preparedness and Response Planning: Guidelines for
Community Corrections," American Probation and
Parole Association, https://www.appa-net.org/eweb/
docs/appa/pubs/PIPRP.pdf.
[2] Ndeffo-Mbah et. al. (June 2018), "Dynamic Models
of Infectious Disease Transmission in Prisons and
the General Population," Epidemiol Rev.; 40(1):
40-57.
[3] https://www.cdc.gov/coronavirus/2019-ncov/
specific-groups/high-risk-complications.html.

At the Yale School of Public Health noted in an article published in the Hartford Courant, "[Y]ou can think of our prisons as sort of nursing homes with bars ... If we're talking about a similarly aging population in our jails here, you're talking about a carceral version of the same situation as you have in Washington State [where nursing homes have been the site of large COVID-19 outbreaks]."[4] As of May 12, 2020, ODRC has reported that of 7,536 tests administered, 4,439 have been positive. That is 59% of the tests administered.[5]

20. This danger has been playing out with disastrous consequences at MCI, which has received wide-spread testing for COVID-19. MCI reported 177 staff members tested positive and one staff member died as a result.[6] At least

---

[4] Lyons, Kelan "Elderly Prisoners in Connecticut vulnerable to potential coronavirus outbreak," Hartford Courant (Mar. 11, 2020), https://www.courant.com/coronavirus/hc-pol-coronavirus-connecticut-prisons-20200311-ote3jd6orje77ip144egibb6i-story.html.

[5] ODRC - COVID-19 Inmate Testing - Updated 5/12/2020.

[6] Id.

2,147 prisoners in the custody of MCI have tested positive for COVID-19.[7] 13 prisoners have died.[8] On April 8, 2020 MCI reported having 2,518 prisoners in quarantine.[9] Of that figure, at least 2,147 have tested positive, meaning 85% of the population has been or continues to be COVID-19 positive.

21. The consequences of COVID-19's invasion into the prison system could have been largely avoided had Governor DeWine and ODRC acted with the same urgency and scope of restriction used for the State-at-large. Instead, thousands of prisoners have been left to languish in fear of the coming viral onslaught. Despite knowing the risks to prisoners, staff, and the community, the Defendants have failed to provide meaningful protection against the spread of the disease. Prisoners are still clustered together in confined spaces with limited access to hygiene and inadequate ventilation.

[7] ODRC - COVID-19 Inmate Testing - Updated 5/12/2020.
[8] ODRC - COVID-19 Inmate Testing - Updated 4/8/2020.
[9] ODRC - COVID-19 Inmate Testing - Updated 5/12/2020.

22. ODRC's manufacturing program, called "Ohio Penal Industries," ("OPI"), has 30 shops in operation, with 1,506 prisoners working in prison shops. Those workers were not subject to Ohio's Stay at Home Order and, as such, continued to work without face masks, social distancing, or appropriate disinfectant.

23. Thousands of elderly, disabled, and medically vulnerable prisoners could be released to safely quarantine in their homes. Many of these prisoners are approaching release dates or are eligible for parole. The reduction of the general population through the release of prisoners, whether medically vulnerable or not, increases the safety of the remaining prisoners, staff, and surrounding communities. Those individuals who remain in the prisons with decreased general populations will be better able to distance and access adequate sanitation. The surrounding communities and medical facilities benefit if prisoners are released to their homes, through the reduced opportunity for uncontrolled clusters in the prison communities.

11

24. The Constitutional prohibition against cruel and unusual punishment requires Defendants to provide safe living quarters, including protection from dangerous infectious diseases.

## VII. FACTUAL ALLEGATIONS

A. COVID-19 Poses a Significant Risk of Illness, Injury, or Death

25. The novel coronavirus that causes COVID-19 has led to a global pandemic.[10] COVID-19 is a new virus that is spread through person-to-person contact with spread more likely when people are within six feet of each other."[11] The State has stated: "[t]he virus is spread between individuals who are in close contact with each other (within about six feet) through respiratory

[10] Betsy McKay et. al., Coronavirus Declared Pandemic by World Health Organization, WALL ST. J. (Mar. 11, 2020, 11:59 PM), https://cutt.ly/U4EuSLC.
[11] CDC - Frequently Asked Questions: Coronavirus Disease 2019 (COVID-19), https://www.cdc.gov/coronavirus/2019-ncov/faq.html

droplets produced when an infected person coughs or sneezes," and that "[i]t may be possible that individuals can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or eyes."[12] Dr. Amy Acton, Director of the State of Ohio's Department of Health, has issued orders demonstrating the State's knowledge that COVID-19 "can easily spread from person to person."[13]

26. The State of Ohio, through Governor Mike DeWine's Executive Order, also declared a state of emergency "for the entire State" in order "to protect the well-being of the citizens of the [sic] Ohio from the dangerous effects of COVID-19." In that declaration, the State of Ohio makes clear that is on notice that COVID-19 is a respiratory disease that can result in serious illness or death.[14]

[12] Ohio Exec. Order, No. 2020-01D (March 9, 2020).
[13] (Ohio Department of Health, Director's Order to Close Facilities Providing Child Care Services (March 24, 2020).
[14] Ohio Exec. Order, No. 2020-010 (March 9, 2020).

The State of Ohio has further acknowledged
that COVID-19 constitutes the presence of "a
potentially dangerous condition which may affect
the health, safety, and welfare of citizens of Ohio."[15]

27. "[P]eople are most contagious [with COVID-19]
when they are most symptomatic (the sickest),
however, some spread might be possible before
people show symptoms."[16] The State also
acknowledges that "community spread" of
COVID-19 — meaning "transmission of an illness
for which the source is unknown, means that
isolation of known areas of infection is no longer
enough to control spread" — has occurred
in the U.S.[17]

28. The ODH stated that "a large number of
people in the general population, including the elderly
and people with weakened immune systems and chronic
medical conditions," face a "significant risk of

[15] Ohio Exec. Order, No. 2020-02D (March 13, 2020).
[16] Ohio Department of Health, Director's Order to Close
Facilities Providing Child Care Services (March 24, 2020).
[17] Id.

substantial harm" due to "high probability of widespread exposure to COVID-19." [18]

29. The State indicated that gatherings of large numbers of people "increase[]s the risk of transmission of COVID-19." [19] The State has cited the "significant risk of substantial harm" due to "high probability of widespread exposure to COVID-19" as the reason for closure of all schools, polling stations, childcare facilities, and adult day care facilities and senior centers. [20]

[18] Id.

[19] Ohio Department of Health, Director's Order In Re: Closure of the Polling Locations in the State of Ohio (March 16, 2020).

[20] ODH, Director's Order in Re: Order the Closure of All K-12 Schools in the State of Ohio (March 14, 2020); ODH, Director's Order in Re: Closure of the Polling Locations in the State of Ohio (March 16, 2020); ODH, Director's Order to Close Facilities Providing Child Care Services (March 24, 2020); ODH, Director's Order Re: Amended Director's Order to Close Facilities Providing Older Adult Day Care Services and Senior Centers (March 24, 2020).

30. Up to one in four people who contract COVID-19 remain asymptomatic, and contagion begins up to 48 hours before symptoms appear.[21] Transmission does not require coughing, and COVID-19 can be spread through merely breathing in the same area.[22] It is impossible to determine whether asymptomatic prisoners have COVID-19 and pose a risk to other prisoners unless or until they show symptoms of the virus.

31. Once contracted, COVID-19 can cause severe damage to lung tissue, including the heart and liver.[23] Even if a person survives COVID-19, the virus

[21] S. Whitehead, "CDC Director on Models For The Months To Come: 'This Virus Is Going To Be With Us,'" NPR (April 2, 2020), https://www.npr.org/sections/health-shots/2020/03/31/824155179/cdc-director-on-models-for-the-months-to-come-this-virus-is-going-to-be-with-us.

[22] E. Cohen, "Experts tell White House coronavirus can spread through talking or even just breathing." CNN (April 2, 2020), https://www.cnn.com/2020/04/02/health/aerosol-coronavirus-spread-white-house-letter/index.html.

[23] CDC, Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19), https://cutt.ly/etRPVRI.

16

can permanently damage lungs, heart, and other organs.[24]

32. People over the age of fifty face a greater risk of serious illness or death from COVID-19.[25] In a February 29, 2020 preliminary report, individuals age 50-59 had an overall mortality rate of 1.3%: 60-69-year-olds had an overall 3.6% mortality rate, and those 70-79 years old had an 8% mortality rate.[26] However, people of all ages can get seriously ill or die. In fact, over half of the people hospitalized for COVID-19 have been under 65 years old.[27]

[24] Melissa Healy, Coronavirus infection may cause lasting damage throughout the body, doctors fear, LA TIMES (April 10, 2020), https://cutt.ly/htNrJ77; see also Di Wu et. al., Plasma Metabolomic and Lipidomic Alterations Associated with COVID-19, MEDRXIV 2020-04.05.20053819 (2020).

[25] Xinuxian Zhao, et. al., Incidence, clinical characteristics, and prognostic factors of patients with COVID-19: A systematic review and meta-analysis, MEDRXIV (Mar. 20, 2020), https://cutt.ly/etRAkmt.

[26] Age, Sex, Existing Conditions of COVID-19 Cases and Deaths, https://cutt.ly/ytEimUQ.

[27] CDC Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) — United States, February 12 - March 16, 2020 (updated Mar. 26, 2020), https://cutt.ly/ztBS3U1.

17

B. The Dangers of COVID-19 are Heightened
   In Prison

33. Numerous public health experts have publicly
    warned that people held in correctional facilities
    are likely to face serious, even grave, harm due
    to the outbreak of COVID-19. Such experts include:

• Dr. Gregg Gonsalves, a professor at Yale School
  of Public Health;[28]
• Dr. Ross MacDonald, Chief Medical Officer for
  Correctional Health Services;[29]
• Dr. Marc Stern, an affiliate faculty member at the
  University of Washington School of Public Health and
  a correctional health care consultant;[30]

[28] Kelan Lyons, Elderly Prison Population Vulnerable to Potential
Coronavirus Outbreak, Connecticut Mirror (Mar. 11, 2020),
https://cutt.ly/BtRSxCF.
[29] Craig McCarthy and Natalie Musumeci, Top Rikers
Doctor: Coronavirus 'Storm is Coming,' NEW YORK POST
(Mar. 19, 2020) https://cutt.ly/ptRSnVo.
[30] Marc F. Stern, MD, MPH, Washington State Jails
Coronavirus Management Suggestions in 3 "Buckets,"
Washington Assoc. of Sheriffs and Police Chiefs
(Mar. 5, 2020), https://EtRSm4R.

- Dr. Oluwadamilola T. Oladeru, a resident physician in the Harvard Radiation Oncology Program at Massachusetts General Hospital, and Adam Beckman, a student at Harvard Medical School;[31]
- Dr. Homer Venters, former chief medical officer of the New York;[32]
- the faculty at JHU schools of nursing, medicine, and public health;[33] and
- Dr. Josiah Rich, a Professor of Medicine and Epidemiology at Brown University.[34]

[31] Oluwadamilola T. Oladeru, et. Al., What COVID-19 Means for America's Incarcerated Population — and How to Ensure It's Not Left Behind, Health Affairs (Mar. 10, 2020), https://cutt.ly/Q+RSYNA.

[32] Madison Pauly, To Arrest the Spread of Coronavirus, Arrest Fewer People, MOTHER JONES (Mar. 12, 2020), https://cutt.ly/jt RSPNK.

[33] JHU Faculty Express Urgent Concern about COVID-19 Spread in Prison, Johns Hopkins Berman Institute of Bioethics, (Mar. 25, 2020), https://bioethics-jhu-edu/news-events/news/jhu-faculty-express-urgent-concern-about-covid-19-spread-in-prison/.

[34] Amanda Holpuch, Calls Mount to Free Low-risk US Inmates to Curb Coronavirus Impact on Prisons, THE GUARDIAN (Mar. 13, 2020), https://cutt.ly/it RSDNH.

34. Carceral settings are ideal for the spread of COVID-19. Prisons are places that are particularly susceptible to contagions, and incarceration poses a grave public health threat during this crisis. It is well-known in the epidemiological community that such facilities are "associated with high transmission probabilities for infectious diseases." [35]

35. When outbreaks occur in custodial facilities, those illnesses lead directly to increased spread beyond those institutions. [36] As stated by Chris Breyer, MD, MPH, Professor of Epidemiology at Johns Hopkins Bloomberg School of Public Health, "[I]t is therefore an urgent priority in this time of national public health emergency to reduce the number of persons in detention as quickly as possible." [37]

[35] Declaration of Chris Breyer, MD, MPH, Professor of Epidemiology, Johns Hopkins Bloomberg School of Public Health, filed in United States v. Toro, E.D-CA Case No. 19-cr-256, DKT 145 (Filed Mar. 23, 2020) at ¶11

[36] Breyer ¶ 12.

[37] Breyer ¶ 17.

36. When outbreak occur, prisoners inside prison
    walls have nowhere to shelter.[38]

37. As noted by Director Chambers-Smith on April
    30, 2020, once COVID-19 has entered an institution,
    there is virtually no way to stop its progression.[39]

38. As of May 12, 2020, COVID-19 has entered all
    but four of Ohio's correctional institutions.[40] Of
    these four, however, two have prisoners with pending
    results from COVID-19 testing.

39. Ohio's prisons, already over-populated, are especially
    susceptible to community spread.

    [38] A. Sweeney and M. Crepeau, "Alarm grows as Cook
    County, state struggle with what to do with
    the incarcerated in the face of COVID-19," Chicago
    Tribune (March 31, 2020), https://www.chicagotribune.com/
    coronavirus/ct-inmate-release-coronavirus-concerns-
    20200331-ehtae5q2rfcihitehdx2wwruiv-story.html.
    [39] Govenor Mike DeWine - 4-30-2020 - COVID-19
    Update: https://ohiochannel.org/video/govenor-mike-
    dewine-4-30-2020-covid-19-update.
    [40] ODRC - COVID-19 Inmate Testing - Updated 5/12/2020.

40. The skyrocketing infection rate within Ohio's prisons demonstrates that the State's CURRENT policies are NOT functional, but, RATHER, Are subjecting tens of thousands of Ohioans to infection, serious medical complications, and the statistically significant possibility of death.

41. There is no projected end to the COVID-19 pandemic. It is anticipated that multiple infection spikes will happen across the country, but at this time there is no end in sight without medical intervention by way of antiviral medications and vaccines, or through herd immunity if it is determined that immunity to COVID-19 can be achieved after infection.[41]

42. There is no timeline for the mass implementation of vaccinations in response to COVID-19. Currently, there is NO vaccine nor is there any specific medication

[41] Yale School of Medicine — COVID-19 is Here. Now How Long Will it Last? https://medicine.yale.edu/news-article/23446/ and Scientific American — How the COVID-19 Pandemic Could End: https://www.scientificamerican.com/article/how-the-covid-19-pandemic-could-end//.

22

that can be used to prevent or treat COVID-19.[42]

43. Currently, scientists do not know whether surviving a COVID-19 infection will provide immunity against future infections.[43]

C. Existing Procedures and Protocols at MCI and Timeline of Relevant Communications and Events

44. MCI has proven that it was and continues to be incapable of preventing and/or containing the spread of COVID-19. The statistics from paragraph 20 illustrate their ineffectiveness.

45. As of June 1, 2020 Plaintiffs have resided in A-Dorm at MCI during all relevant times.

46. A-Dorm consists of an open-dorm style living quarters with 48 double bunks and 4 single bunks.

[42] WHO - Coronavirus disease (COVID-19) advice for the public: Mythbusters: https://www.who.int/emergencies/diseases/novel-coronavirus-2019-advice-for-public/myth-busters/.

[43] CDC - Clinical Questions about COVID-19: Questions and Answers: https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html.

23

47. A-Dorm has 4 rows of bunks, labeled A row, B row, C row, and D row. A row has 13 double bunks. B row has 11 double bunks and 2 single bunks. C row is configured the same or similar to B row and D row is configured the same or similar to A row.

48. A-Dorm's current configuration began on May 29, 2020. Prior to this date, A row had 15 double bunks, B row had 9 single bunks and 6 double bunks, C row had 7 single bunks and 6 double bunks, and D row had 2 single bunks and 12 double bunks. In all, 2 double bunks were removed from A row, 2 double bunks were removed from B row, C row did not need any bunks removed, and D row had 1 double bunk removed.

49. Between B row and C row, a 3 foot high, approximately, wall exists. 2 approximately 3 foot wide aisles exist between A row and B row, and C row and D row, respectively.

50. Each bunk has a minimum of 6 feet of space between them measured from

24

the center of each bunk. Therefore, in actuality, from the edge of one bunk to the edge of each neighboring bunk is approximately 3 feet.

51. A-Dorm has one restroom/shower facility for use by its 90-100 occupants. This consists of 9 showers (not all are functional), two sinks with 6 faucets each (perhaps 1 foot apart), and 7 toilets (each approximately 3 feet apart measured center to center).

52. The wall seperating B row and C row is approximately 1.5 feet wide providing approximately 2 feet of seperation head-to-head.

53. Even after the changes made on May 29, 2020, it is nearly impossible to not come into close contact with one another many times a day. Social distancing in this environment is not possible.

54. Upon information and belief, the only prisoners removed (isolated) from A-Dorm were those whose symptoms included a high enough fever.

Those who exhibited symptoms without a high enough fever or who were Asymptomatic remained housed in A-Dorm.

55. Upon information and belief, only 4 or 5 prisoners were removed from A-Dorm After mass testing. These had tested negative for COVID-19. All remaining prisoners either tested positive or did not receive testing results.

56. Even if MCI provided proper isolation immediately for those with symptoms, asymptomatic people could still spread the virus by remaining in close contact with others.

57. Upon information and belief, MCI did not institute extra precautions or separation of those deemed higher-risk by the CDC.

58. MCI is not sealed off from the community outside them. Indeed, the fact that MCI is not a closed environment is likely how the virus infiltrated the prison. See emails and timeline further in this complaint.

26

59. Various ODRC Staff members communicate with prisoners via the JPAY email, including Defendants Chambers-Smith and Wainwright. These form the basis of most of the following timeline.

60. On March 9, 2020, Defendant DeWine declared a state of emergency, see paragraph 26.

61. On March 10, 2020, an email was sent by Defendant Chambers-Smith informing prisoners that visiting will be temporarily suspended, volunteers entering facilities will be temporarily suspended, and No inmate workers in the community.

62. On March 10, 2020, An email was sent by an Unknown staff member to the entire MCI inmate population suspending all visiting, volunteers, and contractors. Also, this email reported that there are no confirmed cases of COVID-19 within ODRC.

63. On March 10, 2020, An email was sent by Defendant Chambers-Smith to DRC population, subject Coronavirus (COVID-19), Re COVID-19

Fact Sheet. In it, she informed that
"(COVID-19 is ... illness that can spread from
person to person," "...droplets from the
cough or sneeze can land in another person's
mouth/nose ... in close contact to the infected
person. Close contact is when you're within
about 6 feet of the infected person." "what
happens if I do catch COVID-19? ... medical
department will keep you away from healthy
people." and "DRC is working with the Ohio
Department of Health to make sure our facilities
are as safe as we can make them."

64. Upon information and belief, suspended visitation
includes that for attorneys. To date, that
visitation remains suspended. The ability to
engage in attorney-client communication confidentially
is handled on an institution-by-institution basis,
with some institutions having no means by which
attorneys can communicate with their clients
or prospective clients confidentially.

65. On March 11, 2020, an email was sent by
Rhea Edmonds, Director, Correctional Educational
Program informing that "All Marion Tech classes,

27

labs, and ... have been suspended until further notice."

66. But, on March 12, 2020, Marion Tech continued to have in-person classes, including outside instructors, through Spring Break beginning March 23, 2020. Also, the lab was open during Spring Break on the 23rd and 27th of March, including the contractor lab assistant.

67. On March 12, 2020, an email was sent by an unknown staff member regarding "COVID-19 RESPONSE." It stated, "... Facilities are operating normally (programming, recreation, food service, etc) with additional safeguards in place." There was no explanation of these safeguards.

68. In the above referenced email, "Only mission critical contractors (construction, medical, food service, etc.) are permitted into the facilities. Health screenings are in place for individuals who are entering the facilities/offices."

69. On March 13, 2020, an email was sent by Defendant Wainwright explaining that

28

ODRS has no confirmed COVID-19 cases, there's
a ban on congregate gatherings of over 100
people, but the café has a variance.

70. In the above mentioned email, Defendant
Wainwright emphasized "the importance of
handwashing and social distancing."

71- On March 14, 2020, Defendant DeWine
tweeted, "COVID-19 is twice as contagious
as the flu and 20 times more deadly." [44]

72. On March 19, 2020, an email was sent by
S. Brown, RN, Quality Improvement
Coordinator. In it, she stated, "Keep space
between you and the next person so that if
they cough or sneeze their germs do not reach you."

---

[44] Govenor Mike DeWine (@GovMikeDeWine),
Twitter (March 14, 2020, 2:19 PM), https://
twitter.com/GovMikeDeWine/status/
1238892579262992384?s=20.

29

73. On March 19, 2020, Defendant Wainwright sent an email stating, "There are still no confirmed cases of COVID-19 in ODRC. ... barbershops will be closed to comply with the Governor's order. ... Recovery Services activities in A Dorm (Serenity Program) and support group meeting have been suspended. ... Adjustments to mass movement to keep inmates from the same living areas together ... to limit any potential exposures. It is simply not feasible to make this adjustment to all movement particularly for programs and work areas like OPI. ... Remember social distancing, handwashing, and cleaning are key to prevention."

74. On March 23, 2020, Defendant Wainwright sent an email stating, "Several OPI is temporarily closing several shops throughout the department. MCI's OPI shop will remain open."

75. On March 24, 2020, Defendant Wainwright sent an email stating, "... Still no confirmed cases of COVID-19 in ODRC. There are no plans for early releases."

76- On March 25, 2020, Defendant Wainwright sent an email stating, "PPE is limited throughout the United States. Non-medical Staff are Not wearing PPE to align with the current community practice."

77. On March 29, 2020, Defendant Wainwright sent an email stating, "We were informed today that an employee tested positive for COVID-19. ... no positive cases of COVID-19 among the inmate population."

78- On March 30, 2020, Defendant Wainwright sent an email stating, "Still no positive cases of COVID-19 among the inmate population and no additional cases among the staff. ... recreation called by unit ... outside recreation only. Meals will also be called one unit at a time. ... No work call."

79- On March 31, 2020, Defendant Chambers-Smith sent an email stating that if your facility can make masks, "you will be given a mask free of charge. ... permitted to wear ... not required to do so ... NOT classified

31

as personal protective equipment by the Centers for Disease Control."

80. During a press conference at the end of March 2020, Defendant DeWine stated, "Look the most important thing we can do is to keep everyone in our prison safe ... everything she [Director of ODRC] can to keep the virus out of the prisons ... So our focus has been on protecting the people that work in the prisons and the people who are the prisoners. That's our obligation." [45]

81. On April 1, 2020, Defendant Wainwright sent an email stating, "There are two more staff members who tested positive for COVID-19."

82. Most emails sent by Defendant Wainwright close with this sentence: "Please continue

[45] https://ohiochannel.org/video/govenor-mike-dewine-3-29-2020-covid-19-update. Begins about 34:20 into the video.

32

to practice hand washing and focus on social distancing . . . "

83. On April 1, 2020, an email was sent by an unknown staff member stating, " . . . providing everyone a mask . . . precautionary and not mandatory for you to use."

84. On or about April 2, 2020, Plaintiff Dagustino began experiencing symptoms starting with a productive cough for about 7 days. This was followed by low-grade fever, headaches, chills, night sweats, body aches, diarrhea, and vomiting. These were reported to the nursing staff, verbally during daily temperature checks, but the "fever isn't high enough" to be concerned.

85. Many others in A-Dorm were coughing during this same period of time.

86. On ~~March~~ April 6, 2020, Defendant Wainwright sent an email stating, " . . . Share with you . . . operational changes . . . Saturday we were placed on restricted movement . . . now

33

positive cases among the residents at MCI and
Other institutions. Please use your PPE, practice
social distancing ... EVERYONE IS REQUIRED
TO WEAR A MASK. Quarantine will be done
outside the general population units."

87. Upon information and belief, on April 4, 2020,
the managing officer, Defendant Wainwright,
and the Director of ODRC, Defendant
Chambers-Smith invoked O.A.C. 5120-9-11.1
Lockdown.

88. On April 8, 2020, an email was sent by
an unknown staff member stating, "EVERYONE
IS REQUIRED TO WEAR A MASK. STAFF and
INMATES.

89. On April 10, 2020, Defendant Chambers-Smith
sent an email stating, "... everything we
are doing right now is to help keep you as
safe and healthy as possible. ... keep
practicing social distancing when you can."

90. On April 12, 2020, Plaintiff Stores began experiencing symptoms of COVID-19 including headaches, body aches, and chills.

91. On April 13, 2020, Defendant Wainwright sent an email stating, "We are in the process of conducting COVID tests on the entire population... gym ... temporary living space in the event it is needed... moves will be made in the best interest of health and safety."

92. On April 16, 2020, Plaintiffs were administered a test for COVID-19.

93. On April 23, 2020, Plaintiffs Dagostino and Stores received their "positive for Coronavirus" test results. Plaintiff Williams did not receive his results. These were handed to inmates by staff for delivery to the recipient.

94. On April 23, 2020, Defendant Wainwright sent an email stating, "you are required to sleep "head-to-toe" in order to maintain

35

social distancing. Upon information and belief, the previous evening in A-Dorm, the 3rd shift CO woke all top rack prisoners for the purpose of sleeping with head facing aisle.

95. On April 26, 2020, an email was sent by an unknown staff member stating, "There are a lot of words being used by media, the staff, and others about coronavirus. We want to help you understand what is meant... Coronavirus - also known as COVID-19. This is a virus spread that is spread through the air. A person with the disease has to be close to you for more than 15 minutes when they are talking to you before you can catch it too... We are asking that you stay in a COHORT. A cohort is a group of people who stay together. A cohort can be small (like a family) or larger (like a whole dorm)."

96. On April 29, 2020, Defendant Wainwright sent an email stating, "You must practice social distancing on the recreation yard. Do not gather in groups."

97. On April 29, 2020, Plaintiff Williams was administered a test for COVID-19. This was a retest as he never received results from his previous test. Other prisoners who did not receive results were also retested.

98. On May 4, 2020, Plaintiff Williams received his test result. He tested negative, while some other A-Dorm residents tested positive. No one was moved out of A-Dorm.

99. On May 4, 2020, Defendant Wainwright sent an email stating, "It has been determined by the Medical Director that each resident will remain quarantined in their current unit."

100. On or about May 7, 2020, upon information and belief, the ODRC provided hand sanitizer was changed to comply with CDC recommendations.

101. On May 9, 2020, Defendant Wainwright sent an email stating, "... your best defense ... is frequent and proper hand washing ... Social distancing is still as important. Especially at meal pick up times, please keep 6 feet of distance between you and the next man."

102. On May 11, 2020, Plaintiff Williams was administered a blood test for COVID-19 antibodies. His results were negative.

103. On May 18, 2020, Defendant Chambers-Smith stated at a press conference, "As you've mentioned, social distancing is one of the very important things in terms of trying to control the spread of this disease. And that's the one luxury that we really don't have in the Department of Rehabilitation and Correction. ... And it doesn't really help you if you find out that 96% of your positive people are asymptomatic and positive rather than the 20 to 30% you thought you were going to find. ... We really will continue to fight every day. But just understand that a prison system is not a place when it's open

38

bay living where you can keep COVID out for any length of time. It's not a place where it's not going to spread."

104. On May 27, 2020, Defendant Wainwright sent an email stating, "You will be seeing some physical movement of beds within dormitories and at the camp. This is to accomplish social distancing. We need to socially distance head-to-head six feet apart in all dormitory style housing."

105. On May 29, 2020, Defendant Wainwright sent an email stating, "The beds are now six feet apart on center in the upstairs dormitories."

106. A-Dorm is an upstairs dormitory. Six feet on center means 3 feet approximately between bunks.

107. On May 18, 2020, an approximately 75 page, handwritten document, with printed copies of several emails, was sealed in an envelope with attached cash slip and placed in the outgoing mailbox. This document was a prior version of this complaint. It was

being mailed to the wife of Plaintiff Stores for the purpose of typing and processing.

108.  On May 19, 2020, Plaintiff Stores inmate account was charged for the cost of postage of said document.

109.  As of June 1, 2020, Mrs. Stores had not received the aforementioned document.

110.  Plaintiff Dagustino is a 50 year old male. He was diagnosed with Athsma in his early 20s. On April 16, 2020 he was tested for COVID-19. On April 23, 2020 he was informed that he had tested positive for coronavirus.

111.  Plaintiff Stores is a 43 year old male. He is a chronic care patient at MCF suffering from hypertension and pre-diabetes. On April 16, 2020, he was tested for COVID-19. On April 23, 2020, he was informed that he had tested positive for coronavirus.

112. Plaintiff Williams is a 64 year old male. He is a chronic care patient at MCI suffering from hypertension and liver disease. On April 16, 2020 he was tested for COVID-19. On April 29, 2020 he was retested for COVID-19. On May 4, 2020 he was informed that he had tested negative for CORONAVIRUS. On May 11, 2020 he was administered a blood test for the presence of COVID-19 antibodies. He was informed he had tested negative. Throughout this entire process, he remained and still remains in A-Dorm, where prisoners who tested positive were and are housed.

## VIII. CAUSES OF ACTION
### Count I
### Plaintiffs Were Subjected To Cruel and Unusual Punishment In Violation of The Eighth Amendment To The U.S. Constitution

113. Plaintiffs incorporate paragraphs 1 through 112 as though they were stated fully herein.

114. The Eighth Amendment to the United States Constitution, as incorporated against States pursuant to the Fourteenth Amendment to the United States Constitution, guarantees that prisoners may not be subjected to cruel and unusual punishment by state actors. Here, the state actors are required to provide adequate protection, prevention, and healthcare to those incarcerated in their facilities, but have been deliberately indifferent to the serious risk COVID-19 poses.

115. This obligation requires Defendants to protect incarcerated people from infectious and deadly diseases like COVID-19; officials may not wait until someone tests positive for the virus and an outbreak begins.

116. Defendants violated this affirmative obligation and continue to violate it by showing deliberate indifference to substantial risk of serious harm.

117. With respect to an impending infectious disease like COVID-19, deliberate indifference is satisfied when Defendants ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week, month, or year.

118. Here, COVID-19 is sure or very likely to cause serious illness and needless suffering.

119. Defendants were and are aware of the risk, which is obvious, significant, and severe.

120. Defendants' actions and inactions have resulted in the exponential increase in COVID-19 infections within ODRC and, specifically MCI, as they have failed to test, treat, and prevent COVID-19 outbreaks, resulting in a violation of Plaintiffs' constitutional rights to treatment and adequate medical care.

121. Defendants' refusal to reduce prisoner population through immediate release have directly contributed to the unchecked spread throughout the prisons as release would increase the safety not only of the released prisoners but also of those remaining prisoners, staff, and communities.

122. Defendants, as participants and policy makers, have violated the rights of the Plaintiffs guaranteed by the Eighth Amendment to the United States Constitution.

123. Accordingly, Defendants' failure to take medically-required steps to prevent disease and death constitutes deliberate indifference, and their nominal gestures - as by sending directives to the prisoners to engage in social distancing where it is flatly impossible to do so - do not suffice.

## Count II

Plaintiffs Were Subjected To Cruel and Unusual Punishment IN Violation of Article I, Section 9 of the Ohio Constitution

124. Plaintiffs incorporate paragraphs 1 through 123 As though they were stated fully herein.

125. Article I, Section 9 of the Ohio Constitution protects all persons from cruel and unusual punishments.

126. Defendants' failure to implement preventative measures for COVID-19, including testing, adequate sanitation, and the distribution of protective equipment to staff and prisoners Allowed for exponential spread of COVID-19 within the prisons. Defendants' continued confinement of Plaintiffs under these conditions constitutes a violation of Article I, Section 9 of the Ohio Constitution.

45

## Count III
### Unlawful Violation of the Sixth Amendment to the United States Constitution

127. Plaintiffs incorporate paragraphs 1 through 126 as though they were stated fully herein.

128. The Sixth Amendment to the United States Constitution, as incorporated against the States pursuant to the Fourteenth Amendment to the United States Constitution, guarantees the right to the assistance of counsel. Here, the state actors have interfered with the ability to communicate confidentially.

129. MCI has no unrecorded or unsupervised video or telephonic communication methods.

130. Visitation, a means by which attorneys were previously able to confidentially communicate with prisoner-clients has been indefinitely suspended since March 2020.

131. Defendants' failure to institute a policy enabling the continuation of confidential attorney-client communications has violated the rights of

46

Plaintiffs guaranteed by the Sixth Amendment to the United States Constitution.

## IX. PRAYER FOR RELIEF

132. Defendants' actions and inactions have violated Plaintiffs constitutionally guaranteed rights as outlined above and, as such, Plaintiffs are entitled a judgement against Defendants.

133. Plaintiffs are entitled to injunctive relief ordering Defendants to provide:

A. Provisions for adequate spacing of at least six feet between ODRC prisoners so that compliance with physical distancing guidelines may be achieved to prevent the continued spread of COVID-19;

B. In all dormitories at MCI, provide a minimum of 6 feet between the edges of bunks, not center to center;

C. In all dormitories at MCI, provide a minimum of 6 feet spacing between prisoners including those in bunks and those in aisles and/or adjacent rows;

47

D. Immediate release or transfer of prisoners to
   preserve their safety and the safety of the
   remaining prisoners, specifically at MCI,
   through population reduction so that adequate
   social distancing, isolation, quarantining,
   and treatment may be accomplished;

E. The accelerated scheduling of parole hearings
   and re-hearings to review and re-review
   prisoners who have served their minimum
   terms of incarceration and are otherwise
   eligible for release;

F. Schedule Plaintiffs Stores and Williams
   for immediate parole hearing and/or
   rehearing.

G. Ensure COVID-19 positive correctional staff
   do not return to work without proof of
   COVID-19 negative status.

H. Any and all other remedies this Court
   deems necessary and just to address
   the constitutional violations set forth
   above in order to prevent long-term
   consequences and further loss of life;

I. Provide quarantine of persons who have
   come into contact with persons known to
   have COVID-19 or who are displaying

symptoms of COVID-19 with medical checks without additional disciplinary characteristics of segregation.

CONCLUSION

WHEREFORE, Plaintiffs pray for judgement against Defendants as follows:

I. Declare the acts and omissions described herein violated Plaintiffs rights under the Constitutions and laws of the United States and the State of Ohio;

II. Order for injunctive relief;

III. Order compensatory damages in the amount of $750,000.00 (Seven Hundred Fifty Thousand Dollars) and punitive damages;

IV. Order nominal damages, if necessary;

V. Order for reasonable attorneys' fees and costs pursuant to 42 U.S.C. 1988;

VI. Order recovery of the costs and expenses of the plaintiffs in bringing this action;

VII. Grant other just and equitable relief that this Honorable Court deems necessary.

VERITY

Pursuant to 28 U.S.C. 1746, we declare
And verify under penalty of perjury under
the laws of the United States of America
that the foregoing is true And correct.
Executed on June 5, 2020.

Respectfully Submitted,

June 3, 2020

DATE:

Steven Dagustino, pro se
A752584   MCI
P.O. Box 57
Marion, OH 43301

June 3, 2020

DATE:

Andre Stores, pro se
A314976   MCI
P.O. Box 57
Marion, OH 43301

June 3, 2020

DATE:

Willis Williams, pro se
A760782  MCI
P.O. Box 57
Marion, OH 43301

50.

Steven Dagostino A-752584
MCI
P.O. Box 57
Marion, OH 43301

INMATE MAIL
MARION CORRECTIONAL



PLACE STICKER AT TOP OF ENVELOPE TO THE
OF THE RETURN ADDRESS, FOLD AT DOTTED
**CERTIFIED MAIL**

7019 1120 0000 5284 7773

1307

Office of the Clerk
United State District Court
Northern District of Ohio
801 West Superior Avenue
Cleveland, OH 44113-1830